Esquire Deposition Services
(206) 624-9099

Page 1

IN THE UNITED STATES DISTRICT COURT

SILAS CALHOUN, et al.,                )
                                       )
                                       )
         Plaintiffs,                   ) Case No.
                                       )
    vs.                                ) 04-10480-RGS
                                       )
UNITED STATES OF AMERICA, et al.,      )
                                       )
                                       )
         Defendants.                   )
                                       )

VIDEOTAPED DEPOSITION OF DOUGLAS M. WHITESIDE, Ph.D.
April 6, 2007
Seattle, Washington

Reported by:
Connie Recob, CCR, RMR, CRR, CLR
CCR No. 2631
Job No. Boston 9448/Video 9500

Esquire Deposition Services
(206) 624-9099

Page 8

1   variety of different tests and techniques that we use to
2   understand that. Our specialty is in looking at the whole
3   wide range of different abilities that can be affected by
4   neurological injuries: Head injuries, strokes, dementia,
5   learning disabilities, attention deficit disorder, you name
6   it. If it affects the brain, that's really what our interest
7   and specialty is in. So we give a lot of different tests.
8   Some of them are tests that many psychologists will use like
9   the Wechsler adult intelligence scale. Others are more
10  specialized for neuropsychology which really get at kind of
11  fine grained or more difficult to discern sorts of cognizant
12  deficits that may not be readily apparent just to the casual
13  observer. Sorry.
14 Q. Is the testing that you do designed to reveal cognitive
15  deficits even where there are no gross neurological deficits?
16 A. Well, yeah, there's different types of deficits that can
17  happen after brain injury. Sometimes they're quite apparent.
18  For example, somebody might be what we call hemiparetic, in
19  other words, an entire side of their body may be paralyzed
20  because of, say, a stroke. That's a pretty gross obvious
21  problem that, you know, really pretty much anybody can see.
22       But neuropsychology developed out of essentially
23  historically the second world war and veterans coming back
24  with head injuries who had a variety of cognitive problems
25  that were affecting them functionally. You know, they

Esquire Deposition Services
(206) 624-9099

Page 9

1  couldn't adopt and live in the world but there wasn't these
2  obvious problems like the hemiparesis.  So over the years,
3  over the last 40 or 50 years neuropsychology has developed a
4  wide range of techniques that look at a variety of cognitive
5  domains such as attention and concentration, memory, language
6  processing, executive functioning, you know, like
7  decision-making, problem solving, visual spacial abilities
8  and emotional functioning.
9        And the short answer to your question is yes, we do
10 look at and actually specialize in finding deficits that are
11 not necessarily the gross things that you might see on a
12 bedside neurological evaluation.
13 Q. Doctor, at my request did you evaluate Estella Calhoun to
14    determine if she had any cognitive impairments and whether
15    any of those impairments resulted from the brain injuries she
16    suffered in her infancy?
17 A. Yes.  You had requested that I do a thorough
18    neuropsychological evaluation on her because you were
19    concerned about residual cognitive and behavioral problems
20    from this injury she had as a newborn and I did do that last
21    year in May.
22 Q. What did you do in preparation for your report that you
23    issued back last spring?
24 A. Yes.  I reviewed a large number of medical records that you
25    had -- that you had forwarded to me, hospital records,

Douglas Whiteside, Ph.D.
April 6, 2007

c86465dc-2a45-4fa8-abf3-a1a73ec11e18

Esquire Deposition Services
(206) 624-9099

Page 15

1  focused on the tasks that affected her performance.  On the
2  whole it looked like her language processing was generally
3  pretty good.  So yeah, so there were several areas where she
4  did -- where she did just fine.
5  Q. Where did the testing indicate that there were some problems?
6  A. Well, there were two main areas that I noticed that she had
7  difficulty.  One was on several of the assessment tasks she
8  had some trouble with concentration and attention, keeping
9  her attention focused to tasks.  This wasn't an all the time
10 sort of problem, but it did come up from time to time.
11      Counterbalancing that, I noticed that when we provided
12 a lot of structure for her when it was really a well
13 structured task and kept her going with that, she could be
14 redirected easily.  She did tend to get a little bit more
15 distractible later on in the evaluation, not terribly unusual
16 for children, but she could be redirected as long as there
17 was a lot of structure for her.
18      So there were some concentration problems, but she
19 responded really well to structure.  And then the other piece
20 that I noticed that was a problem for her was in integrating
21 visual spacial abilities, in other words, her ability to
22 perceive visual stimuli such as a drawing and being able to
23 integrate a motor response, in other words, a drawing task.
24 In other words, she has to look at a fairly complex design or
25 picture and then copy it as accurately as she can.  That was

Douglas Whiteside, Ph.D.
April 6, 2007

c86465dc-2a45-4fa8-abf3-a1a73ec11e18

Esquire Deposition Services
(206) 624-9099

Page 16

1  really a struggle for her.  She had quite a bit of difficulty
2  with that -- with that rather complex integrative process.
3  Q. Let me understand that and if you can explain it to the
4     Court.
5  A. Sure.
6  Q. Is she shown -- is she shown a diagram?
7  A. Yes.  It's a fairly abstract line drawing, that has a lot of
8     small parts to it so a lot of little details, and the child
9     or adult is asked to copy this as closely as they can.  And
10    like all of our tests, we have norms.  So in other words,
11    we're able to compare her performance with other children of
12    her age and kind of get a sense of what would be typical, you
13    know, in terms of her ability because obviously a
14    six-year-old is not going to do the same as a 12-year-old who
15    is not going to do the same as a 25-year-old.  So I'm able to
16    compare how well she can do with other -- with other
17    six-year-olds, and what I noticed was she had a lot of
18    difficulty on this.  In fact, she was in what we call the
19    mildly impaired range at about the fifth percentile, so she
20    struggled quite a bit with this task.
21 Q. When you say fifth percentile, that means that 95 percent of
22    the people who would be shown and asked to perform this task
23    would perform it better than she would?
24               MR. GIEDT:  Objection; leading.
25               THE WITNESS:  Okay.

Douglas Whiteside, Ph.D.
April 6, 2007

c86465dc-2a45-4fa8-abf3-a1a73ec11e18

Esquire Deposition Services
(206) 624-9099

Page 18

1 terms of copying the same thing with her hand, okay.
2 So that ability to imitate hand positions also gave her
3 a lot of difficulty so we have two different types of tasks
4 requiring two different types of responses but with the same
5 underlying cognitive ability. That was really where her
6 challenge was and that was kind of the common underlying
7 deficit that she had on the evaluation in this domain.
8 Q. In terms of that deficit, how does that translate into the
9 child's functioning, Estella's functioning on a day-to-day
10 basis in various domains?
11 A. Well, children who have these sorts of difficulties in terms
12 of accurately perceiving and integrating visual information
13 can have a variety of different problems. One common problem
14 that I see is with, like mathematics for example, children
15 with visual spacial or visual motor problems often will have
16 difficulty doing math because if you think about it, math is
17 a very visual sort of ability. You know, everything from,
18 you know, lining up numbers to more complex things such as,
19 you know, geometry, trigonometry. You know, in all the
20 different levels of learning math it's really a very spacial
21 skill that we have. So if somebody is having trouble with
22 those kind of visual spacial abilities, it often times will
23 lead to trouble with mathematics. So when I do like a
24 learning disability evaluation, I often -- and I find math
25 disabilities I will often look for these sorts of visual

Esquire Deposition Services
(206) 624-9099

Page 19

1  spacial problems to see if that's what's causing it and many
2  times it is.
3       Another common problem is the ability to pick up like
4  social cues, being able to accurately perceive and understand
5  kind of social interaction. So it can be difficult in people
6  who have these sorts of problems to be able to kind of
7  process, understand, integrate subtle complex social cues,
8  which if you think about it are quite visual in nature. So
9  those are some of the problems that potentially could come
10 up.
11      There's other problems, for example, with reading. If
12 children are misperceiving, you know, the structure of
13 letters, you know, it's going to be more difficult to read.
14 Commonly in, you know, dyslexia, which is a reading learning
15 disability, there are children who have that sort of problem
16 where it's really a visual processing problem. There are
17 other children who have it as more of an auditory processing
18 problem, but that's another area that children could be at
19 quite a bit of risk when they have these sorts of visual
20 processing problems.
21 Q. Were there any other areas of concern or any other particular
22    tests which struck you as significant?
23 A. The -- I should say something about, you know, some of the
24    other tests like, for example, that the parents completed.
25    The parents noted some, like, somatic complaints: Nausea,

Esquire Deposition Services
(206) 624-9099

Page 21

1    so, you know, that discrepancy between the verbal IQ and the
2    performance IQ is consistent with the sorts of difficulties
3    that I had picked up on here with this evaluation.
4            I should say that with this testing that I did, the IQ
5    scores didn't pick up this deficit as much as the more
6    specialized neuropsychological test picked it up.  That's
7    also not unusual.  Like I said, neuropsychological tests are
8    designed to get at more of these fine grained difficulties.
9    IQ scores they're great, but they're really kind of just a
10   big picture sort of thing and they do vary quite a bit.
11   That's why we do the more specialized testing.  But I would
12   say as a bottom line, yes, this result is consistent with the
13   school results from 2003 and I think the school was picking
14   up the same things that I picked up here.
15 Q. Do you have an opinion to a reasonable degree of certainty as
16   to whether the cognitive deficit in visual motor functioning,
17   the visual deficits that you've picked up is likely to have
18   an affect on Estella's academic functioning?
19 A. Yes, I do.  So you're asking about -- let me just make sure I
20   understand what you're asking.  Are you asking would the
21   cognitive deficits that I observed have an impact or an
22   adverse impact on her academic functioning down the road?  I
23   just want to make sure I'm understanding your question.
24 Q. Both currently and down the road.
25 A. Okay.  Yes.  I would say that to a reasonable degree of

Douglas Whiteside, Ph.D.
April 6, 2007

c86465dc-2a45-4fa8-abf3-a1a73ec11e18

Esquire Deposition Services
(206) 624-9099

Page 26

1   p.m. and we're going to go off the record. Thank you.
2                       (Recess 1:45-1:46.)
3           THE VIDEOGRAPHER: The time is now -- the
4   time is now 1:46 and we're back on record. Thank you.
5
6                  EXAMINATION (Continuing)
7   BY MR. APPEL:
8   Q.  Dr. Whiteside, I'm sorry. As you're probably aware we just
9       had a technical glitch and Attorney Giedt and I here could
10      not hear your last answer. I wonder if we can just repeat
11      that.
12  A.  Yeah, as I understand it it did get on the record but you
13      guys obviously didn't hear it. Basically what I said -- and
14      I don't know how much of my answer you caught and didn't
15      catch. But bottom line I was discussing the STAR math report
16      and indicated that the results of this report found that she
17      was at the fifth percentile in math and was at a 0.4 grade
18      equivalent which means that she was at approximately the
19      fourth month of her kindergarten year in terms of her
20      equivalence on math and she was actually physically at the
21      time of this report in about the sixth month of her first
22      grade year. So she's over a year behind in mathematics.
23          The other interesting piece is that in terms of just
24      her grade equivalent she hasn't really changed significantly
25      since I evaluated her last year which is quite concerning.

Esquire Deposition Services
(206) 624-9099

Page 27

1  So she comes out at the fifth percentile and that's, once
2  again, in that mildly impaired range as I conceptualize it,
3  and this result is very consistent with the underlying
4  cognitive deficits that I found in the evaluation last year.
5  Q. Do you have an opinion to a reasonable degree of
6  psychological certainty as to whether or not her cognitive
7  impairments are actually affecting her academic functioning
8  in math at the present time?
9  A. I -- I would say that once again on a more-probable-than-not
10  basis that yes, it is. Students oftentimes, as I indicated
11  earlier, will have problems with areas like mathematics if
12  they have difficulty with visual processing abilities which
13  the assessment results clearly indicated that she did. So
14  this is a common pattern that I see in a lot of children with
15  these types of problems and mathematics seems to be a
16  particularly vulnerable area for children. So yes.
17  Q. Now, in terms of her future functioning, what is the
18  prognosis?
19  A. Well, I would say that given the evidence -- I'm sorry.
20          MR. APPEL: You can go on.
21          THE REPORTER: I didn't hear your
22  objection at all.
23          MR. GIEDT: My objection was that he's
24  opining on an area that was not included within the content
25  of his report in terms of prognosis. So I'm objecting and

Esquire Deposition Services
(206) 624-9099

Page 28

1   moving to strike the testimony, but since we're in a video
2   deposition you can go on.
3 Q. (BY MR. APPEL) You can continue, Dr. Whiteside.
4 A. Well, based on the new evidence here we're clearly seeing a
5   pattern of problems with math and the startling piece of
6   evidence is that she's really not progressing in mathematics
7   over the course of a year which really is quite concerning to
8   me. And I would say that this is probably -- if I had to
9   rank order them, this would be the greatest area of concern
10  that I have for Estella for the future given the particular
11  types of deficits that she has and this additional data
12  because we're clearly seeing a problem unfolding.
13          This is not unusual in children because, you know,
14  children develop and progress quite a bit during these years.
15  So problems that may not be quite as evident at one point in
16  time become clearer as you get a longer baseline. So at time
17  one, which say was when I saw her, you know, she was
18  essentially in kindergarten so there's not a lot of variance,
19  not a lot of variability in what kids do so she came out
20  fairly typical. But now we have time from that point to this
21  point, almost a year, where we're seeing her progression kind
22  of going like this (indicating) not really doing much whereas
23  other children are going like this (indicating.) So whereas
24  last year she was here (indicating) where most children are
25  over time this split is getting wider and wider.

Esquire Deposition Services
(206) 624-9099

Page 29

1      And for example when you have like a learning
2  disability in math, this pattern is not uncommon and if
3  children don't have interventions, don't have treatment,
4  quote, unquote, accommodation, special education programs,
5  this pattern becomes more and more evident. Even with
6  interventions it can be -- still be a problem. So I see that
7  as once again a common pattern, happens all the time with
8  children. And this is probably an area of very significant
9  need that, you know, the professionals need to help her with.
10     Other areas of risk are essentially the things that I
11 talked about before. You know, I'm concerned about her
12 social development. If she's having trouble with visual
13 processing, picking up on visual cues, you know, she's at
14 risk for developing problems in that area and there's the
15 potential for risk in terms of abilities like reading that
16 may not be as evident at this point but may become more
17 evident as the reading material gets more and more complex.
18 So I would say she's at least at risk for problems in those
19 areas as well as the math.
20 Q. Do these problems become more manifest or more clearer as the
21 child gets older and has to respond to more complex
22 information and challenges?
23 A. Yes, that's -- that's very common. I'm sorry. I didn't hear
24 that.
25 Q. You may continue your answer.

Douglas Whiteside, Ph.D.
April 6, 2007

c86465dc-2a45-4fa8-abf3-a1a73ec11e18

Esquire Deposition Services
(206) 624-9099

Page 33

1   Estella.

2          The behavioral issues that Dr. Elwyn noted are many
3   times in many children founded on these sorts of cognitive
4   issues, particularly the attention concentration. So in that
5   respect I'm saying that my -- the neurocognitive disorder --
6   sorry, I can't talk today -- deficits that I found today are
7   consistent with a child who manifests attention deficit
8   disorder. You do see these types of problems in children
9   with that sort of disorder, yes.

10  Q.  Do you have an opinion to a reasonable degree of
11      psychological certainty as to whether the brain injuries that
12      Estella suffered as an infant are a significant contributing
13      factor in her -- the development of her cognitive deficits?

14  A.  Can you rephrase that? I just wasn't quite sure. I want to
15      just make sure I really understand your question.

16  Q.  Yeah. Do you have -- do you have an opinion to a reasonable
17      degree of certainty as to whether or not her early brain
18      injuries are a substantial contributing factor in the
19      development of these cognitive deficits?

20  A.  Oh, okay. Yes, I do have an opinion about that. It's my
21      opinion that -- once again to a reasonable degree of
22      psychological certainty -- the early neurological injuries
23      account for, are consistent with the neurocognitive deficits
24      that I noted at this time. In particular, there's evidence
25      that she had hemorrhages affecting parts of the right

Esquire Deposition Services
(206) 624-9099

Page 34

1   cerebral hemisphere. There's an extensive body of research
2   literature that demonstrates that these sorts of lesions
3   whether it's called by a hemorrhage or an infarct or a
4   seizure or whatever in the right cerebral hemisphere do cause
5   various problems with processing visual information, and
6   that's exactly the pattern we saw with Estella here.
7       As I said, a couple good things is that on the big
8   scheme of things she's in the mildly impaired range not the
9   severely impaired range, but that doesn't mean that she's
10  functioning as a typical six-year-old. You know, she's
11  clearly having much more difficulty than that.
12      So it's always in many cases like this a good news/bad
13  news thing. The good news is that there's things that
14  everybody with cork with. She's not so impaired that, you
15  know, she's hemiparetic. She's not so impaired that she will
16  never be able to succeed. But she's impaired enough that
17  she's going to need extra help, extra assistance, and that
18  ties back to in my opinion the underlying neurological
19  injuries that she had.
20 Q. What recommendations would you make, Dr. Elwyn, (sic) to give
21    her the kind of assistance to give her the best chance
22    academically?
23 A. I believe you might have just called me Dr. Elwyn.
24 Q. Oh, I'm sorry. I'm sorry, Dr. Whiteside. Lots of doctors.
25    I'm sorry.

Douglas Whiteside, Ph.D.
April 6, 2007