UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| SILAS CALHOUN AND EMILY CALHOUN, INDIVIDUALLY, AND AS PARENTS AND NEXT FRIENDS OF ESTELLA CALHOUN, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES OF AMERICA, <br><br> Defendants. | Civil Action No. 04-10480-RGS |

DEFENDANT UNITED STATES'
PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

In accordance with the Court's Order of April 17, 2007, at the close of trial in this case, the United States of America ("United States" or "Government"), by and through its attorney, Michael J. Sullivan, United States Attorney for the District of Massachusetts, submits its Proposed Findings of Fact and Conclusions of Law.

**I**
**BACKGROUND AND SUMMARY**

The plaintiffs bring this claim against the United States[1] under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b) and 2671, *et seq.*, alleging that between February 29 and

---

[1] The plaintiffs' original complaint was filed against the United States, Eric C. Daub, M.D., and Marianne Sutton, M.D. At the time the events giving rise to the plaintiffs' complaint occurred, Dr. Daub was an Air Force doctor acting within the scope of his employment. Pursuant to sections 2679(b) and (d) of the FTCA, 28 U.S.C. §§ 2679(b) and (d), under such circumstances, the United States is the only proper defendant with respect to the claims against Dr. Daub. Accordingly, plaintiffs voluntarily stipulated to the dismissal of all of their claims against Eric M. Daub, M.D., and deemed all of those claims as an action against the United States as the party defendant. Unrelated to the FTCA, the plaintiffs also voluntarily dismissed Dr. Sutton from this action, leaving the United States as the sole defendant.

March 3, 2000, that the United States, through Eric C. Daub, M.D., a U.S. Air Force physician at the Health Clinic at Hanscom Air Force Base ("Hanscom Clinic") in Massachusetts, breached its duty of care and was negligent by failing to appropriately and accurately examine and evaluate Estella Calhoun (a five day old infant at the time), failing to properly monitor Estella, failing to timely diagnose her dehydration and significant hyperbilirubinemia, failing to accurately ascertain Estella's weight, failing to accurately assess the gravity of Estella's weight loss, failing to properly treat Estella, and failure to take proper precautions to avoid injury to Estella. Docket No. 1, Complaint at ¶ 34. Plaintiffs further allege that as a result of these failures, Estella suffers, and will continue to suffer from sensory integration disorder, headaches, disruptive behavior disorder, anxiety disorder, and peer relational problems, and in particular Attention Deficit Hyperactivity Disorder ("ADHD"), and that her parents suffer from a loss of consortium. Docket No. 1, Complaint at ¶¶ 36, 35, 36.

    The United States is entitled to Judgment in its favor because the plaintiffs has failed to make out a *prima facie* case (1) of negligence against the Government with respect to the medical care and treatment provided to Estella Calhoun by Dr. Daub at the Hanscom Clinic between February 29 and March 3, 2000, and (2) of a causal connection between the dehydration and cerebrovascular events Estella experienced in the newborn period and her ADHD and her behavioral, cognitive, and developmental challenges.

## II
## APPLICABLE LAW

As with all tort actions, the plaintiff must prove the traditional tort liability elements for a medical malpractice action including (A) a physician-patient relationship, (B) a duty of care to an accepted standard of medical care, © a breach of that duty, (D) an injury that was proximately caused by the breach of the duty, and (D) compensable damages. Pursuant to the FTCA it is well established that tort actions are governed by the substantive law in the state where the alleged negligence occurred. 28 U.S.C. § 1346(b). Under Massachusetts law, the determining factor for liability in medical malpractice cases is "whether the physician (or other practitioner), has exercised the degree of care and skill of the average qualified practitioner, taking into account the advances in the profession." Primus v. Galgano, 329 F.3d 236, 241 (1st Cir. 2003), quoting Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793, 798 (1968). Further, evidence of a causal connection between the alleged negligence and damages suffered must be established by expert testimony, to a reasonable degree of medical certainty, that the injury sustained was more probably than not a result of the doctor's negligence. Galgano, 329 F.3d 236, 241 (1st Cir. 2003), citing Glicklich v. Spievack, 16 Mass.App.Ct. 488, (1983); see also Primus v. U.S., 287 F.Supp. 2d 119 (D. Mass. 2003. Massachusetts courts rely heavily on expert testimony in assessing the performance of a physician in relation to what other "average qualified practitioners" would have done, given the same circumstances. See generally Steinhilber v. McCarthy, 26 F.Supp.2d 265 (1998); Mitchell v. United States, 141 F.3d 8 (1st Cir. 1998).

**III**
**PROPOSED FINDINGS OF FACT**

1.  Silas and Emily Calhoun were married in 1999, and in February of 2000, Emily Calhoun was living in Massachusetts while Silas Calhoun, an officer in the U.S. Army, was serving a remote tour of duty in Korea. NJT Tr. 1, at 15-16.[2] At this time Emily Calhoun was pregnant with the plaintiff infant Estella Calhoun. Id.

2.  Estella Calhoun was born on February 25, 2000, at Beth Israel Hospital in Boston, Massachusetts, at full term gestation (37.6 weeks) at 8 lb 13 oz. The pregnancy was unremarkable and the birth and post partum period were remarkable only for a shoulder dystocia, some decreased movement of the right shoulder shortly after birth and Apgar scores of 8 and 8 at 1 and 5 minutes. A bilirubin level at about 42 hours of age was 12.2/0.3 and the infant was discharged home at 2 days of age on February 27, 2000, at a weight of 8 lb 8 oz. JEX 1, at 001, 0001–0072.[3]

3.  Estella had a normal and healthy post-birth development period while at Beth Israel Hospital and was noted to be "nursing well with minimal assistance" with multiple notations for bowel movements and urine diapers during her 48 hour stay. JEX 1, at 0011, 023, 0034, 0048–50, , 0001–0072; NJT Tr. 4, at 12-15, 12-50 Dr. Steven L. Ringer, Government's pediatric and neonatal expert ("Dr. Ringer"). Estella's last bowel movement was noted to be sometime on the morning of February 27, 2000, the morning

---

[2] Record citations to the transcript of the non-jury trial are designated by day and page number as NJT Tr. ___, at ___.

[3] Record citations to the Joint Exhibits of the non-jury trial are designated by Exhibit number and page number or range as JEX ___, at ___.

of her discharge from Beth Israel Hospital, and approximately 48 hours prior to her presentation to the Hanscom Clinic. JEX 1, at 0011.

4. On February 29, 2000, Mrs. Calhoun noticed jaundice in Estella's conjunctival, and brought her into the Hanscom Clinic at 11:15 am. JEX 2, at 0074. The medical record for the visit noted that the infant was "passing meconium and urine until three days ago and since then is only having wet diapers." Id. The medical technician, Airman Paul Best, took Estella's vital signs that day, including her weight, 8lb. 13 oz., in accordance with the Hanscom Clinic's procedures to weigh the baby naked. Deposition of Airman Paul Best, at 17-18, 23-26; NJT Tr. 4, at 39–40 (Dr. Ringer).

5. The standard of care in 2000 did not require the recording of the method used for taking vital signs or that the treating physician double check that the proper intake procedures had been followed. NJT Tr. 4, at 28, 49 (Dr. Ringer).

6. Dr. Daub saw Estella and noted "only having wet diapers." He also noted the right shoulder dystocia at birth. At that time, the baby was jaundiced and favored the left arm. Dr. Daub described her skin as "loose" and noted that she had not had a bowel movement in 3 days. Dr. Daub ordered a bilirubin that came back 19.1 (conjugated 0.2). Her hematocrit was 44.5 and hemoglobin 15.3. Per Dr. Daub's handwritten note dated February 29, 2000, Mrs. Calhoun was directed to expose Estella to indirect light and to recheck in 2 days. JEX 2, at 0074. At 3:40 pm that same day, the Hanscom Clinic called Mrs. Calhoun to inform her of the lab results, and per Dr. Daub's order, Estella was booked a follow-up appointment for the next day. JEX 2, at 0075.

7. Estella's stool pattern reported in the Hanscom Clinic medical record on February 29,

        2000, was common for a 4 day old breast fed baby and not a cause for immediate concern or urgent treatment given that Estella's overall presentation and because she had stooled initially after birth. NJT Tr. 4, at 16, 16--29, 42–44 (Dr. Ringer).

8. Estella's loose skin and degree of hydration on February 29, 2000, was appropriately assessed and noted, was not uncommon for a 4 day old breast fed baby and not a cause for immediate concern or urgent treatment. Id., at 18–19, 16–29.

9. Estella's jaundice and bilirubin status on February 29, 2000, was appropriately assessed and noted, was not uncommon for a 4 day old breast fed baby and not a cause for immediate concern or urgent treatment. Id., at 16–29, 43–46.

10. Estella's recorded weight on February 29, 2007, while unusual for a 4 day old infant, was only a single data point, and not a significant or determining factor in assessing Estella's overall status and treatment plan on February 29, 2000. Id., at 34, 16–29, 46–47. The assessment and treatment plan for Estella on February 29, 2000, was appropriately based on Estella's entire presentation and not just a single factor. Id.

11. Dr. Daub's assessment and plan for treatment of Estella Calhoun on February 29, 2000, was cautious and appropriate. Id., at 20–21, 16–29, 46–47.

12. The care and treatment provided to Estella Calhoun by Dr. Daub on February 29, 2007, was thorough and careful and met or exceeded the standard of care for a family practitioner or pediatrician in 2000. Id., 9, 16–29, 39, 86–87.

13. On March 1, 2000, Estella was brought back to the Hanscom Clinic. Dr. Daub noted that "she [Estella] has done quite well overnight. 3 stools, voiding frequently, feeding vigorously. Her parents feel that she is less jaundiced. " JEX 2, at 0076. The medical

technician, Airman Van Hoang, took Estella's vital signs that day, including her weight, 8lb. 2 oz., in accordance with the Hanscom Clinic's procedures to weigh infants naked. Deposition of Airman Van Hoang, at 20–25; NJT Tr. 4, at 39–40 (Dr. Ringer).

14. During the March 1, 2000, appointment Dr. Daub noted that "weight today is down some." JEX 2, at 0076. Dr. Daub's objective findings were that, "She [Estella] is comfortable, in NAD [no apparent distress], asleep when I examined her." Id. Dr. Daub also noted: "However, prior to my [exam], and when she was wanting to be fed, she was crying vigorously." Id. Dr. Daub also observed less jaundice in Estella's hands, feet, forearms and legs. Id. Test results showed that Estella's bilirubin dropped to 18.1 (conjugated 0.7). Id.

15. During the March 1, 2000, appointment Dr. Daub's assessment was that "the initial hyperbilirubinemia in a breast fed baby, bilirubin is dropping." Id.

16. During the March 1, 2000, appointment, Dr. Daub's Plan for treatment was to "insure that the bilirubin continues to fall" by scheduling a follow-up appointment in two days for a "recheck of the billirubin." Id. Dr. Daub also noted that "they [the parents] will follow-up sooner if she [Estella] is worsening or not improving." Id.

17. Estella Calhoun's presentation on March 1, 2000, was improved over her presentation of February 29, and doing well. NJT Tr. 4, at 29–30, 33, 29–33 (Dr. Ringer).

18. Estella's stool pattern reported in the Hanscom Clinic medical record on March 1, 2000, was an improvement from the previous day and common for a 5 day old breast fed baby and not a cause for immediate concern or urgent treatment. Id., at 29, 33, 29–33, 43.

19. Estella's jaundice and bilirubin status on March 1, 2000, was improved from February

29, 2000, was appropriately assessed and noted, and was not uncommon for a 5 day old breast fed baby and not a cause for immediate concern or urgent treatment. Id., at 30–33.

20. Estella's recorded weight loss on March 1, 2007, was common for a 5 day old infant, was only a single data point, and not a significant or determining factor in assessing Estella's overall status and treatment plan on March 1, 2000. Id., at 31, 35–36, 29–34, 46–47. The assessment and treatment plan for Estella on March 1, 2000, was appropriately based on Estella's entire presentation and not just a single factor. Id.

21. Dr. Daub's assessment and plan for treatment of Estella Calhoun on March 1, 2000, was cautious and appropriate. Id.,

22. The care and treatment provided to Estella Calhoun by Dr. Daub on March 1, 2007, was thorough and careful and met or exceeded the standard of care for a family practitioner or pediatrician in 2000. Id., at 9, 29–34, 39, 86–87.

23. On March 3, 2000 at 10:00 am Estella, now 7 days old, was brought back to the Hanscom Clinic for her scheduled follow-up appointment for hyperbilirubinemia JEX 2, at 0077. Dr. Daub noted that "her parents reported that she has not been eating last day is not interested in suckling." Id. Dr. Daub observed that Estella was somnolent (sleepy), her skin was loose, that her weight was down nearly 1 pound and that she had a 100.2 degree temperature. Id. Estella's total bilirubin was down to 15. Id.

24. Dr. Daub immediately had Estella transferred to Emerson Hospital, Concord, Massachusetts for admission to the pediatrician group on call. Id. The referral noted "neonatal hyperbilirubinemia was resolving, but now not feeding and has 1 lb weight loss, please rule out sepsis and re-evaluate bilirubin." JEX 2, at 0078.

25. Dr. Daub's assessment and plan for treatment of Estella Calhoun on March 3, 2000, was appropriate and based on Estella's entire presentation and not just a single factor. NJT Tr. 4, at 37–38 (Dr. Ringer).

26. The care and treatment provided to Estella Calhoun by Dr. Daub on March 3, 2007, was thorough and careful and met or exceeded the standard of care for a family practitioner or pediatrician in 2000. Id., at 9, 37–38, 39, 86–87.

27. According to the Hanscom Clinic and Emerson Hospital records, as reported by Mr. and Mrs. Calhoun, Estella's condition began to deteriorate sometime on March 2, 2000, or sometime during the 24 hours before Estella returned to the Hanscom Clinic on March 3, and over 24 hours after she had been seen by Dr. Daub on march 1, 2000. JEX 2, at 0077; JEX 3, at 0106; NJT Tr. 4, at 48 (Dr. Ringer). Prior to that, all indications were that Estella was on an improving trend. NJT Tr. 4, at 48–49 (Dr. Ringer). Thus, there was no basis or factors for Dr. Daub to react to that would have justified a change in treatment plan on March 1, 2000. Id.

28. The weight of a newborn can often be difficult to accurately obtain and is subject to variability. Id., at 35, 50. Further, the weight of a newborn is a single data point or piece of information which should not be used as the sole determinant of a plan of action, but should be considered together with many other factors. Id., at 34, 36, 37, 46–47, 50.

29. The care and treatment provided to Estella Calhoun by Dr. Daub between February 29 and March 3, 2007, was thorough and careful and met or exceeded the standard of care for a family practitioner or pediatrician in 2000. Id., at 9, 37–38, 39, 86–87, 2–87.

30. Upon admission to Emerson Hospital on March 3, 2007, Estella was noted to have a

9

serum sodium level of 172 and was diagnosed with "severe hypernatremic dehydration." JEX 3, at 0106, 0099–0140. The nursing assessment and vital signs flow chart indicated an admission weight of 7 lbs ½ oz. Id., Emerson Hospital admission records indicate that Mrs. Calhoun reported that Estella's last bowel movement was on February 29, 2000 — the day before her second Hanscom Clinic visit when it was reported that Estella had stooled 3 times over night. Id.; JEX 2, at 0076. According to nursing notes, Mrs. Calhoun reported that Estella had not been eating well the 24 hours prior to admission. JEX 3, at 0106, 0012, 0099–0140.

31. At Emerson Hospital Estella's sodium level was followed very closely and lowered gradually over 48 hours. Id., at 0106–0118, 0099–0140. Mrs. Calhoun was instructed to pump breasts and deliver breast milk with bottle. This led to accurate data for milk consumption and showed adequate intake while hospitalized. Id.

32. A Head ultrasound done on Estella the day after admission to Emerson Hospital was read as "unremarkable infant intracranial ultrasound examination." Id., at 0123; NJT Tr. 4, at 101–102, 88–106, Government's pediatric radiology expert Dr. Ellen Grant (Dr. Grant); NJT Tr. 4, at 143–144, Government's pediatric neurologist expert Dr. Gregory Yim (Dr. Yim).

33. On March 6, 2000, Estella was discharged from Emerson Hospital with a weight of 8 lbs, 9 oz. JEX 3, at 0115, 0118, 0140. Follow-up with a lactation consultant and the Hanscom clinic was arranged prior to discharge. Id. The Hanscom Health and Wellness Center provided Mrs. Calhoun an electric breast pump and a digital electronic baby scale. Id. A lactation consultant from Beth Israel Deaconess Medical Center evaluated mother

and baby at home on March 8, 2000. JEX 2, at 0098.

34. On March 9, 2000, Estella was seen at the Hanscom Clinic by Dr. (Major) Russell T. Coleman. JEX 2, at 0081. Estella's weight was 8 lbs 14.5 oz. Id. The medical technician noted, "Weight check. 80 ml's every 1 ½ hrs. 8-10 weight + dirty diapers." Id. Mrs. Calhoun complained of "occasional twitching", but breast-feeding appeared to be going well. Id. Dr. Coleman evaluated the baby, noting "occasional twitch of left ankle when crying. When lying down does bilateral." Id. Dr. Coleman's exam showed a well child, exam within normal limits, and no jaundice. Id. His assessment was "s/p hypernatremia, dehydration. Doing well now," with a plan to "f/u 2 wks. Monitor weight at home. Expect ¾ -1 oz/day gain. May supplement with isomil prn." Id.

35. At approximately 9:00 pm on March 9, 2000, Mr. And Mrs Calhoun brought Estella to the Boston Children's Hospital emergency room. JEX 4, 0141–0143, 0141–0257g. Estella was intubated and admitted with left sided focal seizures. Id. She was given Ativan to control the seizures along with Phenobarbital. Id.

36. Between March 9 and March 14, 2000, a series of CT scans and MRIs were performed on Estella's brain. JEX 4, at 237A–243. These tests revealed deep cerebral venous and dural sinus thromboses (swelling) and progression of thrombosis involving a right superior frontal cortical vein, and a very small lesion in the right thalmus. Id,

37. With the exception of the punctate (extremely small) lesion in the right thalmus, these conditions were outside of the brain tissue, completely resolved after treatment, and there was no stroke, necrosis or other extensive or permanent injury to Estella's brain that would be considered significant or that affected Estella's development, or that can be associated with Estella's behavioral, cognitive, developmental issues and other

neurological based problems. Id.; JEX 6, at 0284–293b, clinical notes of Andre Duplessis, M.D., Estella's treating pediatric neurologist at Children's Hospital (Dr. Duplessis); NJT Tr. 4, at 99-100, 102–103 (Dr. Grant); NJT Tr. 4, at 119–122, 138–150 (Dr. Yim).

38. The plaintiffs' neurology expert, Dr. Hart, agreed that CAT scans and MRIs are some of the best tools available to use to evaluate brain structures and abnormalities, and that they are extensively relied upon by neurologists in diagnosing neurological injuries. NJT Tr. 2, at 46–47. Dr. Hart also conceded that he had not reviewed Estella's MRI or CAT scans or reports at the time he prepared his expert report and opinion. Id., at 47.

39. There was no diffuse brain injury or encephalopathy as suggested by the plaintiffs' expert Dr. Hart. NJT Tr. 4, at 99-100, 102–103 (Dr. Grant); NJT Tr. 4, at 157–159 (Dr. Yim).

40. Estella was discharged from Children's Hospital on March 15, 2000, into the care of a civilian pediatrician with close neurological/developmental follow up. JEX 4, at 146–149. Upon discharge she was breast feeding, and urine and stool output were adequate. Id. The summary documents the brain radiology tests, notes Estella was on maintenance Phenobarbital and had no further seizures. Id. The Discharge Physical showed a pink, vigorous full term infant in no distress. Id.

41. Subsequent pediatric records show Estella was taken off Phenobarbitol 3 months later.JEX 6, at 0284–293b (Dr. Duplessis). They indicate Estella had made age-appropriate developmental milestones and that she was fully recovering from the cerebrovascular event she had experienced during her newborn time period. Id. Specifically, in the records of the last visit with Dr. Duplessis on March 28, 2001, it notes that Estella was advanced in several areas, including gross motor skills. Id., at 291–292.

12

        Dr. DuPlessis noted at that time that they found no evidence of "any significant clot . . . especially one of any functional development." Id. Consequently, he felt no need to continue monitoring. Id.

42. Dr. DuPlessis' findings are consistent with the conclusions reached and literature cited by the Government's pediatric neurology expert, Dr. Gregory Yim, that there is no neurological sequelae associated with the dehydration or cerebrovascular event Estella experienced during her newborn time period. NJT Tr. 4, at 116, 117–137 (Dr. Yim). Nor can the newborn events be associated with Estella's behavioral, cognitive, developmental issues and other neurological based problems. Id.

43. Plaintiffs' neurology expert, Dr. Hart, could not cite to any literature or studies linking Estella's ADHD, or her behavioral, cognitive, and developmental challenges to her dehydration or cerebrovascular events. NJT Tr. 2, at 52–53.

44. For there to be a neurological connection with Estella's problems, a clear and identifiable neurological deficit, such as an obvious motor or sensory deficit, would have been identified by Dr. DuPlessis during the 12 plus months he evaluated Estella. Id., at 135–136, 117–137; NJT Tr. 5, at 67–68 (Dr. Yim). No such deficit was identified and Dr. DuPlessis discharged Estella with a very positive prognosis. Id., JEX 6, 0291–0292.

45. The area of the brain that was affected by Estella's newborn cerebrovascular event, the right thalmus, is not even implicated in the condition of ADHD, and therefore cannot provide an explanation for Estella's ADHD or other challenges. NJT Tr. 4, at 145–154 (Dr. Yim); NJT Tr. 5, at 62–66, and 72–74 (Dr. Yim) (questions to Dr. Yim from the Court).

46. Dr. Yim's conclusions findings, neurologically, that there is no connection with Estella's newborn dehydration and cerebrovascular events and her ADHD or developmental and behavioral challenges, are further supported by clinical evaluations conducted after Estella concluded her care with Dr. Duplessis, and, with one exception, the noticeable absence of any connection in the many other clinical evaluations of Estella performed up until she was almost six years old. NJT Tr. 4, at 137–139 (Dr. Yim); NJT Tr. 5, at 39–41 (cross examination of Dr. Yim and statement by plaintiffs' counsel at 40), NJT Tr. 5, at 69–70 (Dr. Yim).

47. Only a single treating physician, Dr. David K. Urion, noted a possible connection. JEX 4, at 0252–0254. And Dr. Urion also noted that Mr. and Mrs. Calhoun reported that there is a paternal uncle who is said to be hyperactive, and that Mr. And Mrs. Calhoun seemed to need extra help for short periods pf time in their elementary school years. Id.

48. Estella has been diagnosed with ADHD by several practitioners and by the various experts retained by the parties in this action.

49. ADHD is a differential diagnoses with no clear defined etiologies. There is no test for ADHD. NJT Tr. 4, at 153–154, 155–157; NJT Tr. 5, at 2–6 (Dr. Yim); NJT Tr. 2, at 52–53 (Dr. Hart).

50. Dr. Yim, the Government's pediatric neurology expert has diagnosed Estella's ADHD as mild and in remission, and with an excellent prognosis for improvement. Similarly, Jefferson Prince, the Government's pediatric psychiatry expert, has reviewed the records and has also concluded that Estella's prognosis is good and that she is on an overall improving trend. NJT Tr. 5, at 6–11; NJT Tr. 5, at 74–133, Government's pediatric psychiatry expert, Jefferson Prince, M.D. (Dr. Prince.).

51. Dr. Prince believes that there are more plausible and documented reasons in the medical and other records for Estella's ADHD and other behavioral challenges that are rooted in family and social factors or life stressors, and not a result of an injury or Estella's newborn dehydration or cerebrovascular events. NJT Tr. 5, at 71–100, 74–133 (Dr. Prince).

52. Dr. Prince carefully examined the record and has identified numerous events and life stressors in Estella's life that coincide with Estella's exhibiting specific behaviors and other problems. Id. These factors include the Calhoun's marriage, the birth of Estella, the stress of Estella's newborn events, the birth of her brother Cy, then the birth of the Calhoun's twins, the deployment of her father back to Korea and other military absences, the family move to Hawaii, and her father's observation of Estella being taunted and teased in the neighborhood because of her color. Id.

53. The plaintiffs' neurology expert, Dr. Hart, acknowledged that life stressors should be considered when evaluating a child for ADHD, and that if a child is more vulnerable, for whatever reason, then these life stressors may have more of an impact. NJT Tr. 2, at 50–52 (Dr. Hart).

54. Dr. Prince believes that these life stressors are more plausible explanations for Estella's problems because (1) the timing of events and stressors coincide with Estella's presentation of behavioral and developmental problems, (2) other clinicians that have treated or evaluated Estella for her problems have made the same observations, and (3) more significantly, Estella has exhibited a trend of improvement over the past several years as she has become older and her life has become more stable in Hawaii. Id.

55. In particular, Dr. Prince reviewed Estella's various testing scores over the past several

years and explained how the data demonstrated that Estella is improving. Id., at 101–111. With respect to partial records and data on Estella that were produced just prior to trial, Dr. Prince concluded that the material was not complete and could not be used to materially alter his conclusion that Estella is on an improving trend. Id., at 106.

56. Additionally, Dr. Prince noted based on Dr. Urion's report, that consistent with Estella's improving trend, Estella may simply be paralleling her parents since they needed a little help during the elementary school years. Id., at 109–110.

57. Dr. Prince believes, like Dr. Yim, that if Estella's problems were neurologically based, her deficits would be static, would have manifested soon after her newborn events, and she would not have shown the improvement that she has over the past several years. Id.

58. The plaintiffs' psychiatric expert, Dr. Elwyn, initially diagnosed Estella's ADHD as mild and in remission and that Estella was on an improving trend with a good prognosis for recovery in his expert report. Dr. Elwyn also made many of the same observations as Dr. Prince with respect to family and social factors and life stressors. However, Dr. Elwyn later stepped back from his favorable prognosis opinion at his deposition based on the incomplete academic testing results and school records that Dr. Prince could not rely on. Video Deposition of Todd Elwyn, M.D.; NJT Tr. 5, at 97–99, 129–130 (Dr. Prince).

59. Similarly, the plaintiffs' psychological expert, Dr. Whiteside, made an initial diagnosis of improvement with a positive prognosis in his expert report, and then modified the conclusions with a less positive prognosis at deposition based on the partial and incomplete data that Dr. Prince could not rely on. Video Deposition of Dr. Whiteside; NJT Tr. 5, at 110–112, 130 (Dr. Prince).

# IV
# PROPOSED CONCLUSIONS OF LAW

The United States is entitled to Judgment in its favor because the plaintiffs has failed to make out a *prima facie* case (1) of negligence against the Government with respect to the medical care and treatment provided to Estella Calhoun by Dr. Daub at the Hanscom Clinic between February 29 and March 3, 2000, and (2) of a causal connection between the dehydration and cerebrovascular events Estella experienced in the newborn period and her ADHD and her behavioral, cognitive, and developmental challenges.

First, plaintiffs have failed to demonstrate, to a reasonable degree of medical certainty, that Dr. Daub breached a duty of care to Estella or that he did not exercise the degree of care and skill of the average qualified practitioner when he treated Estella.  Primus v. Galgano, 329 F.3d 236, 241 (1st Cir. 2003), quoting Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793, 798 (1968); see also Primus v. United States, 287 F.Supp.2d 119 (D. Ma. 2003) ( applying Arizona law but noting that as a practical matter there are no relevant differences in the malpractice law of Arizona and Massachusetts).  As a consequence, plaintiff's have also failed to demonstrate, to a reasonable degree of medical certainty, that Dr. Daub's treatment was the proximate cause of Estella's dehydration.

As the facts and expert testimony of Dr. Ringer demonstrate, Dr. Daub clearly met or exceeded the standard of care of the average qualified practitioner.  Most significantly, he conducted thorough and careful examinations of Estella on three different visits and assessed her condition each time on Estella's entire presentation and not just a single factor.  The plaintiffs have focused primarily on the single factor of weight and alleged that the failure of the Hansom Clinic staff to properly weigh Estella, and Dr. Daub's failure to recognize the error, were the

17

cause of Estella's eventual dehydration and cerebrovascular events.  However, the medical records and facts do not support this proposition.  While very important, weight can be an inexact and variable factor, and is only a single data point for evaluating a newborn.   Weight must be considered in concert with other factors such as hydration status, blood tests, bilirubin levels and the physical appearance of the newborn.  Dr. Daub thoroughly and effectively applied this evaluation process to Estella and closely monitored her progress to a point of noted improvement on her second visit.  Notwithstanding this improvement, Dr. Daub was still concerned and scheduled a follow-up visit 2 days later, but provided instructions to return if Estella did not continue to improve or worsened.  From the medical records recounting the Calhoun's reports, it appears that Estella stopped improving and began to worsen approximately 24 hours after her second visit with Dr. Daub when improvement was clearly indicated. However, the Calhoun's did not return to the Hansom Clinic until 48 hours later for the scheduled appointment, at which time Dr. Daub quickly evaluated and assesed Estella's condition, based on several factors, and immediately referred her to Emerson Hospital for emergency treatment.  Further, because Estella was stable and improving following the second visit, there was no plan of tratment that Dr. Daub could have implemented that could have predicted or prevented Estella's worsening 24 hours later.

   Thus, Dr. Daub met or exceeded the degree of care and skill of the average qualified practitioner when he treated Estella, and the plaintiffs have failed to demonstrate, to a reasonable degree of medical certainty, that Dr. Daub breached a duty of care to Estella or that he did not meet the standard of care.  As a consequence, plaintiff's have also failed to demonstrate, to a reasonable degree of medical certainty, that Dr. Daub's treatment was the proximate cause of Estella's dehydration. Accordingly, the United States is entitled to Judgment in its favor in this

18

action.

Second, plaintiff's have failed to demonstrate a causal connection between the dehydration and cerebrovascular events Estella experienced in the newborn period and her ADHD and her behavioral, cognitive, and developmental challenges. Primus v. Galgano, 329 F.3d 236, 241 (1st Cir. 2003), quoting Brune v. Belinkoff, 354 Mass. 102, 235 N.E.2d 793, 798 (1968); Mitchell v. U.S., 141 F.3d 8, 13 (1st Cir. 1998); Poyser v. U.S., 602 F.Supp. 436, 438 (D.Mass. 1984); Harlow v. Chin, 405 Mass. 697 (1989) (generally, causation and negligence can be proven only through expert testimony); see also Primus v. United States, 287 F.Supp.2d 119 (D. Ma. 2003) ( applying Arizona law but noting that as a practical matter there are no relevant differences in the malpractice law of Arizona and Massachusetts).

As demonstrated by the testimony of Drs. Grant and Yim, there is nothing in Estella's medical record or in the medical literature that supports the plaintiffs' contentions that (1) Estella sustained significant or lasting injury to her brain from the dehydration and cerebrovascular events she experienced, and (2) that Estella's ADHD and her behavioral, cognitive, and developmental challenges were caused by the dehydration and cerebrovascular events she experienced. Further, Dr. Prince has demonstrated that significant psychosocial or life stressor factors in Estella's life provide a more plausible explanation for her ADHD and her behavioral, cognitive, and developmental challenges, and that Estella is on a improving trend.

Thus, plaintiffs have failed to demonstrate, to a reasonable degree of medical certainty, the proximate cause prong for liability in this action. Accordingly, the United States is entitled to Judgment in its favor in this action.

                                        Respectfully submitted,

                                        UNITED STATES OF AMERICA

                                        MICHAEL J. SULLIVAN
                                        United States Attorney

By:   /s/ Anton P. Giedt   9/19/2007
         Anton P. Giedt
         Assistant U.S. Attorney
         1 Courthouse Way
         Boston, MA 02210
         617-748-3309 (Voice)
         617-748-3971 (Fax)
         anton.giedt@usdoj.gov

---

**CERTIFICATE OF SERVICE**

Suffolk, ss.                                                                          Boston, Massachusetts
                                                                                           DATE:September 19, 2007

   I, Anton P. Giedt, Assistant U.S. Attorney, do hereby certify that I have this day served a copy of the foregoing upon the Plaintiffs' counsel of record by Electronic Filing.

                                                                               /s/ Anton P. Giedt
                                                                               Anton P. Giedt
                                                                               Assistant U.S. Attorney